Filed 1/27/25  In re R.D. CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| In re R.D., <br><br> a Person Coming Under the Juvenile Court Law. | B338360 <br><br> (Los Angeles County Super. Ct. No. 23CCJP01890) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br>      Plaintiff and Respondent, <br><br>      v. <br><br> T.B., <br><br>      Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Judge Pro Tempore.  Affirmed.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Veronica Randazzo, Deputy County Counsel, for Plaintiff and Respondent.

_____

T.B. (Mother) challenges the juvenile court's finding at the six-month review hearing pursuant to Welfare and Institutions Code[1] section 366.21, subdivision (e) that the Los Angeles County Department of Children and Family Services (DCFS) provided her with reasonable reunification services. Mother argues services were inadequate because DCFS failed to facilitate a minimum of nine hours per week of monitored visitation with her daughter R.D. as ordered. R.D.'s presumed father D.D. (Father) is not a party to this appeal.

We conclude substantial evidence supports the juvenile court's finding and thus affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Petition, Jurisdiction, Disposition, and Prior Appeal

We derive the following factual and procedural summary from Mother's prior appeal of the juvenile court's disposition order. (*In re R.D.* (Nov. 25, 2024, B333795) [nonpub. opn.].)

In May 2023, DCFS received a report that Mother had engaged in domestic violence against Father in R.D.'s presence. At the time, R.D. was less than one year old. R.D. was placed with maternal grandmother and her teenage half-siblings, P.W.

_____

[1] All subsequent unspecified statutory references are to the Welfare and Institutions Code.

and L.W., who had been in maternal grandmother's care under a plan of legal guardianship since 2015.

DCFS filed a section 300 petition alleging that, among other things, Mother's violence against Father created a substantial risk that R.D. would suffer physical harm and that Mother failed to protect R.D. from Father, who suffered from substance abuse and mental health issues.

The court sustained all counts in the petition and, on October 10, 2023, removed R.D. from her parents' custody. It ordered monitored visitation for Mother for a minimum of three visits per week for three hours per visit. Maternal grandmother, who had previously refused to host visits at her home due to Mother's lack of anger management, informed the court that she was no longer willing to monitor Mother's visits regardless of where they occurred. The court ordered that DCFS facilitate the visits or provide a referral for a human service aide (HSA) to act as a monitor and granted DCFS discretion to liberalize visits. Mother's counsel requested a three-month progress report, and the court scheduled a January 12, 2024 hearing for that purpose.

Mother appealed the removal order. We affirmed, stating, "Mother had a history of losing her temper and becoming physically violent beginning in 2012 up through 2023 . . . , and the court had reason to believe that by the time of the disposition hearing, Mother had not yet learned to adequately manage this behavior such that returning R.D. to her custody would place R.D. at substantial risk of harm." (*In re R.D.*, *supra*, B333795.) Mother remained in a relationship with Father, who had not adequately addressed his mental health and substance abuse issues. Further, Mother continued to deny any domestic violence

3

between them.  Accordingly, we concluded substantial evidence supported the court's removal order.

## B.    Three-month Progress Review

In a last minute information (LMI) filed on January 11, 2024, DCFS reported that since the disposition hearing Mother had completed seven therapeutic group sessions relating to domestic violence and anger management.  According to a counselor, Mother made good progress in the program but had not attended during the last few weeks.  As to individual therapy, Mother was assessed and received a recommendation for treatment.  However, she did not return to therapy.  DCFS reported a positive change in Mother's behavior until she stopped attending these programs in December 2023.

As to visitation, on September 27, 2023, a different DCFS social worker was assigned to Mother's case.  The social worker reported that prior to his involvement, Mother had visits on Fridays and Saturdays.  The social worker's services log indicates that he supervised a visit on October 28, 2023, but the record does not specify the frequency of Mother's visits with R.D. between September 27 and October 31, 2023.  Beginning in early November 2023, DCFS reported that monitors were not available for Mother's visits with R.D., and there were no visits on November 4 and 10, 2023.  On November 11, 2023, the social worker attempted to reschedule the visit for an earlier time "[d]ue to the holiday weekend," but maternal grandmother "was unable to accommodate."

On November 15, 2023, DCFS approved L.B., who Mother had recommended, as a potential monitor.  However, L.B. did not have a car.  On November 22, 2023, DCFS attempted to schedule a visit monitored by L.B. that would have required maternal

4

grandmother to drive R.D. to a park. Both maternal grandmother and Mother informed the social worker they would not drive to the other's neighborhood. As a result, DCFS was unable to schedule a visit.

Maternal grandmother reportedly felt bad for Mother and, on Thanksgiving Day, began monitoring visits between Mother and R.D. at maternal grandmother's home. The visits were for nine or more hours and occurred mostly on weekends. On December 18, 2023, maternal grandmother reported Mother was doing well. On January 8, 2024, however, maternal grandmother reported Mother "blew up" at her after maternal grandmother did not pick Mother up for a visit on New Year's Day because she wanted to rest. As a result, maternal grandmother was no longer willing to monitor visits. The social worker reported that he was working on creating a new visitation schedule. According to the social worker's services log, on January 9, 2024, the social worker texted Mother. The social worker did not receive a response from Mother until February 11, 2024. DCFS recommended that Mother's visits with R.D. remain monitored.

At the hearing on January 12, 2024, Mother requested that the court award her unmonitored visitation. She argued DCFS had not provided visitation every week as ordered, and that DCFS "failed to transport" R.D. to Mother for visits. Mother requested that the court "order an assessment or best efforts for an HSA available on the weekends" and provide transportation assistance.

DCFS argued Mother's request should be made via a section 388 petition. It further argued the court could not order DCFS to provide an HSA because that was a matter of internal management for the agency and, thus, an executive function.

5

During the hearing, the court observed, "Mother looks like she is trying to bully her way through to achieve her goals," and that maternal grandmother had agreed to monitor the visits until Mother blew up at her.

Mother, speaking for herself, informed the court that maternal grandmother's assertions were false and asked for proof. She advised the court she would sue DCFS for taking away her rights and argued she had not had any visits (which as explained above was not true). The court responded, "I can see why Mother has burnt her bridges. She is hostile." The court ordered all prior orders remain in effect, including that visitation be monitored.

## C.    Six-month Review

### 1.    *The Report*

DCFS filed a six-month status review report on March 15, 2024. It described that on February 11, 2024, Mother texted the social worker to request visits with R.D., and to inform DCFS that Mother planned to sue DCFS for taking away her rights. On February 14, 2024, the social worker asked Mother if L.B. was still willing to act as a monitor. Mother did not answer the question, and instead complained about the lack of visitation and the social worker's failure to correct it. The social worker responded that he could arrange visits if Mother had a monitor; otherwise, the social worker could clear someone to monitor the visits.

On February 15, 2024, the social worker spoke with maternal grandmother. Maternal grandmother agreed for visits to occur on Saturdays but stated she would only release R.D. to an approved monitor. The social worker informed Mother that L.B. had to be present to pick up R.D. as well as to drop off the

child. Mother requested that the social worker telephone L.B. about this. The social worker left a message for L.B., but L.B. did not return the call. Mother then recommended another monitor, R.B., to supervise visits. Given the short notice, DCFS could not approve R.B. in time for a visit on February 17, 2024.

On February 22, 2024, maternal grandmother reported that Mother called to speak with P.W. and L.W., Mother's older daughters. Maternal grandmother heard Mother screaming at them over the phone and intervened. Maternal grandmother explained that Mother wanted P.W. and L.W. to spend time with Father although he was not their father. Maternal grandmother played a recording for the social worker with Mother "screaming in a rage at the top of her lungs, 'I'm going to kill you, you stupid bitch,' multiple times, referring to [maternal grandmother]."

On February 23, 2024, the social worker informed Mother that R.B. had been cleared to monitor visits. On February 24, 2024, maternal grandmother reported that Mother did not participate in her scheduled visit that day. Maternal grandmother stated that "[M]other got into an altercation with [Father]" and then received a ticket for driving under the influence of alcohol (DUI). DCFS confirmed that on February 23, 2024, Mother received a DUI citation.

On February 28, 2024, a social worker made an unannounced visit to Mother's residence. Mother did not answer the door, and the social worker left a business card. Mother telephoned the social worker and told him he could not show up unannounced at her home. The social worker asked what happened with respect to her last scheduled visit with the minor. Mother responded that the social worker knew what had occurred because maternal grandmother had told him. Mother screamed

at the social worker. He asked her not to scream, and she responded by asking if he wanted to hear her "actually scream." Mother demanded a new social worker and ended the call.

On March 1, 2024, maternal grandmother texted the social worker to inform him that R.B. had stated she no longer wanted anything to do with Mother.

On March 2, 2024, maternal grandmother reported that Mother arrived at her home unannounced to see the children; there is no record evidence that a monitor accompanied Mother, meaning the visit would have violated the visitation order. When maternal grandmother refused to let Mother in, Mother attempted to kick in the front door and smashed the video doorbell. Maternal grandmother called police, but Mother left before they arrived. Maternal grandmother obtained a temporary restraining order against Mother, and a hearing for a permanent restraining order was scheduled for March 25, 2024. The record does not reflect whether maternal grandmother obtained a permanent restraining order.

On March 4, 2024, Mother asked the social worker to clear A.S. as a monitor and stated that R.B. was "no good." Mother reported that because R.B. had "flaked," Mother brought L.B. to act as a monitor, but maternal grandmother would not let her visit. The record does not state whether this was a scheduled visit or when this occurred. The social worker inquired whether Mother was available for visits on days other that Saturdays and reported that Mother indicated "she now had Fridays available."

The social worker was unable to clear A.S. for monitoring. Mother then recommended K.F. as a monitor. In the meantime, DCFS staff monitored a visit on March 8, 2024, at a DCFS office.

K.F. was thereafter cleared, and the social worker scheduled a visit for March 16, 2024.

Mother's neighbor informed the social worker that the residents in Mother's unit were "always fighting" and that the neighbor often heard door slamming and yelling between 12:30 a.m. and 2:00 a.m. A police call log for Mother's address revealed that the police received a call for alleged domestic violence on January 13, 2024, calls for "unknown trouble" on February 14, 21, and 22, 2024, and a call for possible domestic violence on March 8, 2024. DCFS reported Mother had confirmed multiple times that she intended to continue her relationship with Father.

DCFS confirmed Mother participated in a parenting class through September 12, 2023. A representative from that program stated that Mother actively participated and was a pleasure to have in class. Further, prior to June 2023, Mother had completed 10 anger management group therapy sessions, and prior to December 2, 2023, had completed an additional seven sessions. With respect to individual therapy, Mother received three referrals, but she did not begin therapy sessions with any of those providers. On March 12, 2024, Mother enrolled in individual therapy, completed an assessment, and scheduled an appointment for March 22, 2024.

DCFS reported Mother was in partial compliance with her case plan, continued to have anger management issues, and continued to deny that her relationship with Father created a risk of harm to R.D. DCFS recommended that the court terminate reunification services.

9

2. *April 3, 2024 LMI*

In an LMI filed on April 3, 2024, DCFS reported Mother contacted the social worker to discuss DCFS's recommendation that the court terminate reunification services. The social worker explained that although Mother had participated in programs, DCFS did not consider Mother's behavior to have changed. Mother stated she had done everything DCFS had asked, and that maternal grandmother was manipulating the social worker. Mother denied any domestic violence or anger issues and claimed DCFS wrongly removed R.D. from her. Mother stated the social worker had not provided her with nine hours of visitation per week. The social worker explained that Mother had requested to have monitors known to her, but that visits were difficult to arrange when the monitors canceled. Mother cursed at the social worker, including calling him a "mutha f***" and an "ugly a** Asian n***a[]," and threatening "I'm going to come after you" and "You think that [I] can't get you[?]." Due to Mother's behavior, the social worker moved two upcoming visits to an office where security was present.

The LMI also indicated Mother provided DCFS with a February 5, 2024 certificate of completion for a 12-week anger management course.

3. *Concurrent Planning Assessment*

In a concurrent planning assessment filed on March 15, 2024, DCFS reported Mother and R.D. had had 20 visits in the last six months.

4. *The Hearing*

At the April 4, 2024 six-month review hearing, Mother argued she had moderately complied with the case plan and requested that the court provide further family reunification

10

services.  As to visitation, Mother acknowledged she proposed monitors who "flaked."  However, Mother argued she participated in her case plan, visited with R.D., and that six additional months of reunification services would be beneficial.  Minor's counsel supported additional reunification services for Mother.

DCFS argued R.D. was under the age of three.  Mother had more than six months of reunification services, "hasn't learned a thing with regards to domestic violence and anger management," required maternal grandmother to seek a permanent restraining order as late as March 2024, and made threats and cursed at people.  Further, Mother and Father continued to have contact.

The court stated it was "too early to throw in the towel.  I think Mother should be given the opportunity to show that she is interested in having this child in her care."  Mother apologized to the court for her past outbursts, noted she was in therapy, and said that she wanted to participate in more reunification services to become a better parent and get R.D. back.  The court explained it would give her "one final opportunity to complete the case plan."  The court then inquired when Mother and R.D. had last visited.  Mother responded the social worker had not scheduled visits for two months.  The court observed that it did not blame the monitors because Mother "scares people off."  Mother responded that she "t[ook] full responsibility" and was "working on it."

The court found DCFS made reasonable efforts to provide reunification services, that Mother partially complied with the case plan, and that returning R.D. to Mother's custody would create a substantial risk to R.D.'s well-being.  Over DCFS's objection, the court ordered further reunification services for Mother, ordered that DCFS assess an HSA for Mother's visits,

and scheduled a combined 12- and 18-month review hearing for October 2, 2024.

## DISCUSSION

### A. General Legal Principles Relating to Family Reunification Services

"The purpose of California's dependency law is 'to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.' [Citation.] In its effort to achieve this overarching goal, the law balances a number of vital interests: children's interests in safe and stable homes; parents' interests in raising their children; families' shared interests in each other's companionship; and the state's interest in protecting society's most vulnerable members. [Citations.]" (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 623-624.) "To balance the interest in family preservation with the child's interest in the prompt resolution of her custody status and long-term placement, the dependency law establishes a detailed timeline for reunification. For qualifying parents, the minimum length of reunification services depends on the age of the child at the time of removal. (. . . § 361.5, subd. (a)(1).) Parents of children under three are presumptively eligible for at least six months of reunification services. (See *id*., subd. (a)(1)(B).)" (*Id*. at p. 625, fn. omitted.) For such children, reunification services should be provided "no longer than 12 months from the date the child entered foster care." (§ 361.5, subd. (a)(1)(B).) However, "court-ordered services may be extended up to a maximum time period not to exceed 18 months after the date the child was originally removed from

12

physical custody of the child's parent" under certain circumstances.  (*Id.*, subd. (a)(3)(A).)

"During the reunification stage, the juvenile court must hold periodic review hearings to evaluate the status of reunification efforts and appropriate next steps.  (. . . § 366.21.) These review hearings ordinarily take place at six-month intervals.  At each review hearing, a court evaluates, among other things, the adequacy of the reunification services offered or provided and the extent of the parent's progress.  If, at the six- or 12-month status review hearing, the court finds that there is a substantial probability the child may be returned to her parent within six months, or that reasonable services were not provided to the parent, the court extends reunification services for an additional six months rather than proceed to the final stage of dependency proceedings, permanency planning.  (. . . §§ 361.5, 366.21, subd[]. (e)(3) [for children under three] . . . .)  The court may schedule the section 366.26 permanency planning hearing 'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.'  (. . . § 366.21, subd. (g)(4).)  In other words, at the six- and 12-month status hearings, the court must find that the parent has been provided or offered reasonable reunification services before the court can proceed to set a hearing to decide whether to terminate parental rights and select a permanent plan for the child." (*Michael G. v. Superior Court, supra,* 14 Cal.5th at p. 625, fn. omitted.)

To support a finding that reasonable services were offered or provided, the record should show that DCFS identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with

13

the parent during the reunification period, and made reasonable efforts to assist the parent in areas where compliance proved difficult.  (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 691.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We review a reasonable services finding for substantial evidence based on that clear and convincing standard.  (*In re M.F.* (2019) 32 Cal.App.5th 1, 14, disapproved on another ground by *Michael G. v. Superior Court, supra*, 14 Cal.5th at p. 631, fn. 8.)  In determining whether substantial evidence supports the court's reasonable services finding, we review the record in the light most favorable to the finding and draw all reasonable inferences from the evidence to support it.  (*In re M.F., supra*, at p. 14.)  We do not reweigh the evidence or exercise independent judgment, and the burden is on the appellant to show that the evidence is insufficient to support the court's findings.  (*Ibid*.)

## B. DCFS Provided Reasonable Reunification Services Under the Circumstances

No party takes issue on appeal with Mother receiving further reunification services.  Mother's sole argument is that DCFS failed to provide her with reasonable services during the first six months of the dependency proceedings because it did not facilitate regular visits between her and R.D.[2]  DCFS argues that

---

[2] Although the court here extended reunification services for another six months, "a parent . . . can [be] aggrieved by a reasonable services finding at the time of the six-month review hearing if it is not supported by substantial evidence.  Such a

Mother forfeited this argument because she did not raise it in the juvenile court. We disagree. Mother complained during the six-month review hearing that DCFS failed to provide adequate visitation. Even if she had not done so, a party's failure to raise a substantial evidence challenge in the juvenile court does not forfeit the issue for purposes of appeal. (See *In re Javier G.* (2006) 137 Cal.App.4th 453, 464.)

Visitation is a critical component of a reunification plan. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972.) "In order to maintain ties between the parent . . . and the child, and to provide information relevant to deciding if, and when, to return a child to the custody of his or her parent . . . , any order placing a child in foster care, and ordering reunification services, shall provide . . . [¶] . . . for visitation between the parent . . . and the child. Visitation shall be as frequent as possible . . . ." (§ 362.1, subd. (a).)

The law requires that DCFS provide reasonable reunification services under the circumstances of the case before it. (See *In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547.) Here, during the six months prior to March 15, 2024, Mother had 20 visits with R.D., and the chronology makes clear the social worker made repeated efforts to facilitate additional visits, including timely efforts to clear persons suggested by Mother to act as monitors. The fact those additional visits did not occur was not due to a lack of reasonable effort by DCFS. It was

---

finding can put the interests of parents and children in reunification at a significant procedural disadvantage." (*In re T.G.* (2010) 188 Cal.App.4th 687, 695.)

primarily because of Mother's actions and those of her own proposed monitors.

Mother argues that DCFS did not provide reasonable reunification services because she did not have visits with R.D. in November until Thanksgiving Day, and then, after January 1, 2024, she did not have any visits until March 8, 2024. In November 2023, the social worker attempted to schedule four visits. Mother wanted monitors known to her—in other words, friends instead of someone from DCFS. Monitors were not available on two occasions and maternal grandmother could not accommodate the third proposed date. For the fourth attempted visit, Mother's monitor L.B. did not have a car, and Mother could not agree with maternal grandmother on a visitation location.

Thereafter, maternal grandmother agreed to act as a monitor, and Mother had visits with R.D. between Thanksgiving and mid-to-late December. That stopped not because of DCFS but because Mother lost her temper and blew up at maternal grandmother. After maternal grandmother refused to monitor visits due to Mother's actions, the social worker texted Mother on January 9, 2024, but Mother did not respond until over a month later on February 11, 2024. Between February 14 and 17, the social worker attempted to arrange a visit with L.B. as a monitor, but L.B. did not return the social worker's call. The record indicates that Mother made an 11th-hour proposal of R.B. as a monitor, but the social worker could not clear R.B. in time for the February 17 visit. Soon after, the social worker was able to clear R.B. and scheduled her to monitor a February 24 visit. However, that visit did not occur because Mother was arrested for driving under the influence and did not appear for the visit.

On March 1, 2024, the social worker learned that R.B. no longer want to serve as a monitor. The social worker then set to determine whether A.S. and K.F., two other potential monitors proposed by Mother, could be cleared. In the meantime, the social worker arranged a March 8, 2024 visit for Mother and R.D. to be monitored by DCFS staff.

Based on the court's statement that Mother was hostile, Mother argues her behavior should not have deterred DCFS from providing staff to act as a monitor because DCFS specially trains its staff to deal with difficult personalities such as hers. Mother's argument presumes DCFS did not assign its staff to monitor her visits because of her behavior. Nothing supports this contention. Instead, Mother expressed a preference for monitors that she knew, and it was those monitors (such as maternal grandmother and R.B.) that chose not to participate as a result of Mother's aggressiveness. Indeed, even after Mother threatened the DCFS social worker, he continued to facilitate visits, scheduling them at a location with security.

Accordingly, we conclude substantial evidence demonstrates DCFS provided reasonable reunification services under the circumstances.[3]

---

[3] Mother argues in a conclusory fashion that at the January 12, 2024 hearing, the court should have ordered DCFS to assess an HSA to serve as a monitor. The court previously made such an order on October 10, 2023, and reiterated it on April 4, 2024; it never modified or retracted that order between those two dates. To the extent Mother nevertheless believes she was aggrieved by what occurred at the January 12, 2024 hearing, her notice of appeal does not list that hearing and in any event was filed well after 60 days from the court's January 12, 2024

17

## DISPOSITION

The juvenile court's April 4, 2024 order is affirmed.

NOT TO BE PUBLISHED

WEINGART, J.

We concur:

BENDIX, Acting P. J.

M. KIM, J.

---

order.  We therefore lack jurisdiction to consider her claim.  (*In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1488.)